UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ARCHIE WILLIAMS                                              CIVIL ACTION

VERSUS

CITY OF BATON ROUGE, ET AL.                       NO. 20-00162-BAJ-SDJ

## RULING AND ORDER

Plaintiff in this civil rights case was wrongly convicted for rape in 1985 and spent thirty-five years in prison. On March 17, 2020, he filed suit against numerous individuals for their alleged role in his conviction. (Doc. 1). These included Defendants Marjorie Groht, Alfred Charles Mondrick, and Steven Woodring, police officers involved in Plaintiff's arrest and conviction, and the City of Baton Rouge; and Defendants Sybil Guidry, a fingerprint examiner for the Louisiana Bureau of Identification, Patrick Lane, a forensic scientist with the Louisiana State Police Crime Lab, and Nace Jerry Miller, a serologist with the Louisiana State Police Crime Lab (*hereinafter*, the "Forensic Defendants"). Now before the Court is Plaintiff's **Motion for Summary Judgment (Doc. 64)** against Defendant Patrick Lane, and the Forensic Defendants' **Motion for Summary Judgment (Doc. 96)**. In both, the Defendants assert the defense of qualified immunity. Both Motions are opposed. (Docs. 99, 118). For the reasons that follow, Plaintiff's Motion will be denied, and the Forensic Defendants' Motion will be granted.

I.   **BACKGROUND**

a. **Summary Judgment Evidence**

The facts set forth below are drawn from the parties' competing statements of material fact and the competent summary judgment evidence submitted in support of these pleadings.

On December 9, 1982, a white woman was raped and stabbed multiple times in her Baton Rouge residence which she shared with her husband and two children. (Doc. 64-2 ¶ 1). The assailant, a black man who acted alone, forcibly entered the house and took the woman to a second-story bedroom. (*Id.* ¶ 2). The woman recognized him "immediately" as someone who had come to her back door around a month earlier saying he was lost. (Doc. 67-1 at 6). She was face-to-face with him multiple times during the incident. (*Id.* at 15, 16, 20). During the assault, the woman noticed a three-inch-long scar on the attacker's right arm. (*Id.* at 17).

While the sexual assault was in progress, the woman's minor daughter arrived at the house, accompanied by Stephanie Alexander, an adult, and Ms. Alexander's minor daughter. (*Id.* ¶ 3). After Ms. Alexander entered the house, she went to the bedroom and found the armed assailant and the woman, whose hands were visibly bloody. (*Id.* ¶ 6). In the bedroom, Ms. Stephanie was thrown against the wall, covered her eyes, and "kept saying I can't see you . . . I don't know who you are . . . I can't identify you . . . [j]ust get out of here." (Doc. 67-1 at 19–20). The assailant ordered Ms. Alexander to lie down, after which he fled and was not seen again. (*Id.* ¶ 7). The whole attack lasted between ten and fifteen minutes. (*Id.* ¶ 5).

Following the assault, the victim was treated at Baton Rouge General Hospital, where a rape kit was prepared following a gynecological examination. (Doc. 99 at 19). At the hospital, police officers arrived and worked with the victim to create a picture of the assailant. (Doc. 67-1 at 23). Separately, Ms. Alexander worked with officers to create a composite sketch of the assailant. (*Id.* at 25).

While still in the hospital, officers began bringing photo lineups for the victim to look at. (*Id.* at 25). Officers continued bringing lineups to the victim when she was released from the hospital. (*Id.* at 26). In one of those lineups, the victim identified an individual who she thought "strongly resembled the man" who had attacked her, but the man in the photo had different hair. (*Id.*). The police brought a different photo, this time in profile, but the hair of the man in the photo was not right. (*Id.* at 28). Finally, officers brought her a lineup and she "jumped out of the chair screaming this is the one." (*Id.*). Testifying at trial, the woman related that after seeing the photo, "[i]t was the best feeling in the world to know that there wasn't any doubt left in [her] mind." (*Id.*). She did not "hesitate in any fashion" when identifying the man. (*Id.* at 31). Two days later, the woman went to a physical lineup where she "saw him instantly." (*Id.* at 33). The man she identified was Plaintiff Archie Williams, and she identified him in open court at his trial. (*Id.*). Following her open-court identification, Plaintiff stood before the jury to reveal a scar on his right arm. (*Id.* at 35). The victim identified the scar as the one she saw on the arm of the man who raped her. (*Id.*).

Defendant Patrick Lane, a forensic scientist with the Louisiana State Police Crime Lab responded to the house following the assault, where he lifted fingerprints

3

and took photographs of the scene. (*Id.* ¶ 11). Defendant Sibyl Guidry, Lane's coworker, assessed the fingerprint evidence from the scene of the crime. (Doc. 96-2 ¶ 8). No fingerprint evidence connected Plaintiff to the crime. (*See* Doc. 70-1 ¶ 44).

Defendant Nace Jerry Miller examined the victim's rape kit, determined that it contained seminal fluid, and performed blood-type testing in an attempt to identify the attacker. (Doc. 99 at 19). Miller's testing was inconclusive, and he was only able to determine that around 90% of the male population could have produced the sperm. (Doc. 96-36 at 41). Shortly before Plaintiff's trial, Miller prepared a report, writing that "results indicate that the seminal fluid in the vaginal washing and on the swab could have originated from Archie Williams." (Doc. 73-32).

Plaintiff was convicted on April 21, 1983, and sentenced to 30 years for aggravated burglary, 50 years for attempted murder, and life in prison for aggravated rape. (Doc. 64-1 at 3). No physical evidence connected him to the crimes. (*See* Doc. 99 at 14; Doc. 96-1 at 3). For 36 years, Plaintiff maintained his innocence. In 2019, he was released from prison when latent fingerprint evidence recovered at the crime scene was examined using a fingerprint database created in 2014 and a different individual was identified as the attacker. (Doc. 70-3 at 4).

### b. Procedural History

On March 17, 2020, Plaintiff filed this lawsuit against the City of Baton Rouge and numerous officials for their alleged misconduct in the investigation and prosecution of the criminal case for which he was convicted. Specifically relevant here, Plaintiff alleged Fourteenth Amendment violations under 42 U.S.C. § 1983

4

against Defendants Lane and Guidry for failure to disclose exculpatory crime scene evidence, fabrication of crime scene evidence, and conducting a reckless investigation; and against Defendant Miller for fabrication of serological evidence, failure to disclose exculpatory serological evidence; as well as state law claims for malicious prosecution, spoliation of evidence, intentional infliction of emotional distress, and negligence against all Defendants. (Doc. 10).

Now, Plaintiff moves for summary judgment on his claims against Defendant Lane, (Doc. 64), and the Forensic Defendants move for summary judgment on Plaintiff's claims, asserting qualified immunity, (Doc. 96). Both Motions are opposed, in part: Plaintiff failed to respond to Defendant Guidry's assertion of qualified immunity. (Docs. 99, 118).

## II. LAW AND ANALYSIS

### a. Standard

The summary judgment standard is well-set: to prevail, Defendants must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this assessment, the Court must view all evidence and make all reasonable inferences in the light most favorable to Plaintiff—the non-moving party. *Owens v. Circassia Pharms.*, Inc., 33 F.4th 814, 824 (5th Cir. 2022). Even so, under the Federal and Local Civil Rules, Plaintiff must counter with evidence to support his claims: "A non-movant will not avoid summary judgment by presenting speculation, improbable inferences, or unsubstantiated assertions." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019)

(quotation marks omitted); *see also* M.D. La. Local Rule 56. To the point, summary judgment is required if Plaintiff fails to "produce any summary judgment evidence on an essential element of [his] claim." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### b. Discussion

The Forensic Defendants invoke qualified immunity. The qualified immunity doctrine turns the traditional summary judgment burden on its head, requiring Plaintiff—the *non-moving* party—to "demonstrate the inapplicability of the defense." *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) (quotation marks omitted). To meet his burden, Plaintiff must "(1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were clearly established at the time of the violation." *Id.* (quotation marks omitted). The Court may address either prong of the analysis first, *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 473 (5th Cir. 2019), and Plaintiff's failure to carry his burden at one prong is fatal, *e.g.*, *Babinski v. Sosnowsky*, 79 F.4th 515, 522 (5th Cir. 2023). The Court will address the arguments of each Defendant in turn.

### i. Defendant Lane's claim of qualified immunity

Plaintiff alleges that Lane suppressed a crime scene photograph of a bloody palm print in violation of Plaintiff's Fourteenth Amendment right to due process. (Doc. 10 at 21). In *Brady v. Maryland*, 373 U.S. 83 (1963) the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment,

6

irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The prosecutor's duty to provide favorable evidence includes impeachment evidence and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). The prosecutor's duty to disclose evidence includes both evidence in its own possession and any other "favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

To prevail on a *Brady* claim, Petitioner must show: (1) the prosecutor suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to guilt or punishment. *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) (citing *Brady*, 373 U.S. at 87). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. The materiality analysis "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence,' or whether, 'after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.'" *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008) (quoting *Kyles*, 514 U.S. at 434–35). To succeed on a *Brady* claim, a defendant must "show[] that the

7

favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. "A *Brady* violation is more likely to occur when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration.'" *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) (quoting *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)).

"[A] *Brady* determination is inevitably a contextual inquiry, involving questions of both law and fact." *Sipe*, 388 F.3d at 479. A *Brady* inquiry "is intimately intertwined with the trial proceedings: because the court must judge the effect of the evidence on the jury's verdict, the *Brady* decision can never be divorced from the narrative of the trial. In addition, the court must consider not simply the withheld evidence in isolation, but also the quantity and quality of other evidence in the record." *Id.* "[W]hen the undisclosed evidence is merely cumulative of other evidence [in the record], no *Brady* violation occurs." *Id.* at 478 (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996)). "Similarly, when the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be material." *Id.* (citing *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)). Conversely, if the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material." *Id.* (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)).

8

Here, Plaintiff fails to establish a "reasonable probability" that the result of his 1984 trial would have been different had the allegedly suppressed crime scene photograph been presented at trial. *Bagley*, 473 U.S. at 682.

The photograph in question, labeled 10-5 by the parties, was one of twenty-six taken by Lane and others at the crime scene on December 9, 1982. (Doc. 99-1 ¶ 11). The image captures bloody smears, measuring around eight centimeters across, on a wall or doorframe. (Doc. 99-8). A fingerprint lifted from the blood at the left side of the smear did not identify Plaintiff, and a black-and-white image of that fingerprint was presented at trial as Exhibit S-12. (Doc. 67-2 at 17).[1] S-12 was described by Lane as a "bloody print" from the scene of the crime. (*Id.*). As confirmed by both Plaintiff's and Defendants' experts, at the time of trial, no additional print evidence could be extracted from 10-5. (Doc. 96-21 at 93–94; 96-23 ¶ 50).

Plaintiff argues that despite the presentation of S-12 at trial, the description of S-12 as a bloody print by multiple witnesses, (Doc. 67-2 at 17; Doc. 67-12 at 6), and

---

[1] In his opposition to Defendants' Motion, Plaintiff disputes whether print S-12 is from the bloody smear depicted by photograph 10-5. (Doc. 99 at 4–9). This argument, which Plaintiff does not put forward whatsoever in his own Motion, is contrary to the findings of the experts retained by both parties, (*see* Docs. 96-21 at 95; 96-23 ¶¶ 45–51), and Plaintiff's own assertions, (*compare* Doc. 64-2 ¶ 67 (describing S-12 as "contain[ing] obvious similarities to the ridge patterns" visible on the left side of the bloody smear in 10-5) *with* Doc. 99 at 6 ("Only a cursory analysis of 10-5 and S-12 is required to observe the obvious dissimilarities between these two items of evidence. . . ."). Contrary to Plaintiff's argument, S-12 does appear to display a print captured in 10-5. (*See* Doc. 67-9 (displaying the two images side by side)). Moreover, the unsupported statements of counsel are not evidence, and cannot defeat summary judgment. *Wilson v. Ly Invs., L.L.C.*, No. 1:20CV300-HSO-RHWR, 2022 WL 493669, at *3 (S.D. Miss. Feb. 17, 2022) ("Statements by counsel in briefs are not evidence . . . ." (quoting *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980))).

the admission that S-12 was not from Plaintiff, the failure to present 10-5 was material for *Brady* purposes. (*See* Doc. 64-1 at 17). The Court disagrees.

Plaintiff was convicted at trial even though it was made clear to the jury that no fingerprint evidence, including prints in blood, connected him to the crime. (*See* Doc. 70-1 ¶ 44). In opening argument, the prosecutor acknowledged that "none" of the fingerprints taken from the scene "match[ed] the defendant" and admitted that "there [were] two fingerprints taken from the scene that [didn't] match anybody. . . ." (Doc. 96-37 at 7–8). Likewise, the defense counsel in his opening asked the jury to "[p]ay close attention [to] those fingerprints" because "none of those fingerprints are [Plaintiff's], none." (Doc. 96-37 at 12). At closing argument, defense counsel referred repeatedly to fingerprints in blood that did not belong to Plaintiff. (Doc. 96-19 at 5–6). Plaintiff's conviction appears to have been based entirely on the tragically mistaken testimony of the victim herself. Because the evidence shows that the jury knew that prints in blood from the scene of the crime were not connected to Plaintiff, even if 10-5 had been admitted and was indeed suppressed by Lane, its effect would have been cumulative to evidence already in the record. "[W]hen the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs. *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

For these reasons, Defendant Lane is entitled to qualified immunity.

### ii. Defendant Miller's claim of qualified immunity

Plaintiff also argues that Miller fabricated and failed to disclose exculpatory serological evidence in violation of *Brady*. The evidence does not support this claim.

10

"A criminal defendant's due process rights are violated when the government obtains a conviction with testimony that government agents know is false." *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 (1959)). "A false or scientifically inaccurate report is equivalent to any other false evidence created by investigators, such as a false police report; . . . there is no reason a government scientific expert should enjoy immunity greater than that of other investigators." *Id.* (quotation omitted).

Miller played a minor role in Plaintiff's trial. Based on his testing of physical evidence from the victim's rape kit, Miller produced a report stating that the evidence "could have originated from Archie Williams." (Doc. 73-32). Miller also testified at trial, essentially repeating the same conclusion. (*See* Doc. 96-10 at 15–16).

Plaintiff argues that Miller's report should have referenced "the fact that approximately 90% of the population could also not be excluded as the source of the seminal fluids extracted from [the victim's] rape kit." (*Id.* at 20). This omission, according to Plaintiff, "was misleading to the point of being scientifically inaccurate" because "approximately 90% of the population" could also have been potential donors. Plaintiff also argues that Miller's failure to perform enzyme testing of the evidence, which could have excluded Plaintiff, was a further *Brady* violation. (Doc. 99 at 22–25).

Plaintiff relies heavily on a U.S. Court of Appeals for the Fifth Circuit opinion that affirmed a denial of qualified immunity to Miller at the motion-to-dismiss stage on similar *Brady* claims by a different exonerated plaintiff. (*Id.* at 22–25 (citing

11

*Brown*, 519 F.3d at 237). There are crucial differences, however, between that case and the facts here. There, the plaintiff alleged that Miller "overstated the results of the blood tests he conducted, effectively fabricating evidence by overstating his results and putting forward misleading scientific conclusions." *Brown*, 519 F.3d at 237. Miller's report in *Brown* listed two possible conclusions regarding the blood test but inexplicably left out a third, equally viable, alternative conclusion. *Id.* at 234–235. Had the third alternative been included, the results of the blood test would have been inconclusive. *Id.* The report was therefore a knowingly false representation. More egregiously, and despite the inconclusive results, Miller allegedly "gave verbal confirmation of a positive match to an investigating officer" after which the officer "swore out an affidavit that Brown had been positively identified by the blood test." *Id.* at 235 (quotations omitted).

Here, in contrast, Miller merely reported that the evidence "could have originated from Archie Williams"—a true statement. (Doc. 73-32). Record evidence suggests that the practice in place at the time was to leave percentages out of crime lab reports. (Doc. 96-36 at 80). Moreover, Miller testified openly and honestly at trial, agreeing that based on the blood test results, "there [was] no way that [he could] say absolutely that" Plaintiff was the assailant. (Doc. 96-10 at 7). In *Brown*, Miller left out information crucial for understanding his results from both his report and testimony at trial. Under the specific factual circumstances present in this case, however, the Court cannot conclude that Miller failed to disclose or fabricated

12

exculpatory evidence, and therefore Miller is entitled to qualified immunity on this claim.

Plaintiff also claims that Miller could have performed additional testing but did not, again relying heavily on *Brown*. In *Brown*, however, plaintiff's allegations that Miller had "[run] additional tests besides those he reported . . ., that the results exculpated Brown, and that Miller [had] concealed, suppressed, or destroyed these results" survived at the motion-to-dismiss-stage, where the allegations were accepted as true. *Id.* Here, at summary judgment, Plaintiff only alleges that Miller could have performed the tests but did not do so. However, the failure to perform tests does not violate *Brady*. *See Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) ("Brady does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence."); *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."). Accordingly, Miller is also entitled to qualified immunity on this claim.

### iii. Defendant Guidry's claim of qualified immunity

Plaintiff alleges that Guidry should have performed an exclusion analysis on S-12, the bloody fingerprint, but he failed to contest Guidry's assertion of qualified immunity. A party waives an issue by failing to brief it. *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001). Moreover, the Local Civil Rules require that parties support their arguments with "a concise statement of reasons . . . and citations of

authorities," M.D. La. Local Rule 7(d), and this Court has repeatedly admonished that it will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf. *See Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 650 F. Supp. 3d 452, 477 n.13 (M.D. La. 2023) (Jackson, J.) (citing authorities). For this reason, Guidry is entitled to qualified immunity.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants Nace Jerry Miller, Sybil Guidry, and Patrick Lane's **Motion for Summary Judgment (Doc. 96)** be and is hereby **GRANTED**, and that all claims against Defendants Miller, Guidry, and Lane be and are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's **Motion for Summary Judgment (Doc. 64)** be and is hereby **DENIED**. Judgment will enter separately.

**IT IS FURTHER ORDERED** that the deadlines set forth in the April 15, 2024 Telephone Status Conference (Doc. 129) be and are hereby **CONTINUED WITHOUT DATE** pending the Court's ruling on the Motion for Summary Judgment (Doc. 115) filed by Defendants City of Baton Rouge, Marjorie Groht, Alfred Charles Mondrick, and Steven Woodring.

Baton Rouge, Louisiana, this 10th day of June, 2024

BRIAN A. JACKSON, JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA