UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ARCHIE WILLIAMS                                                      CIVIL ACTION

VERSUS

CITY OF BATON ROUGE, ET AL.                          NO. 20-00162-BAJ-SDJ

RULING AND ORDER

Plaintiff in this civil rights case was wrongly convicted for rape in 1985 and spent thirty-five years in prison. On March 17, 2020, he filed suit against numerous individuals for their alleged role in his conviction. (Doc. 1). These included Defendants Marjorie Groht, Alfred Charles Mondrick, and Steven Woodring, police officers involved in Plaintiff's arrest and conviction, and the City of Baton Rouge/Parish of East Baton Rouge (City/Parish), (*hereinafter*, the "Police Defendants"); and Defendants Sybil Guidry, a fingerprint examiner for the Louisiana Bureau of Identification, Patrick Lane, a forensic scientist with the Louisiana State Police Crime Lab, and Nace Jerry Miller, a serologist with the Louisiana State Police Crime Lab (*hereinafter*, the "Forensic Defendants"). The Court granted summary judgment to the Forensic Defendants in June 2024. (Doc. 132). Now before the Court is the Police Defendants' **Motion for Summary Judgment (Doc. 115, the "Motion")**, in which these Defendants assert the defense of qualified immunity. The Motion is opposed. (Doc. 130). For the reasons that follow, the Motion will be granted.

## I.     BACKGROUND

### a.  Summary Judgment Evidence

The facts set forth below are drawn from the Court's prior Ruling and Order (Doc. 132) on the Forensic Defendants' summary judgment motion, the parties' competing statements of material fact, (Docs. 115-3, 130-1), and the competent summary judgment evidence submitted in support of these pleadings.

On December 9, 1982, a white woman was raped and stabbed multiple times in her Baton Rouge residence which she shared with her husband and two children. (Doc. 64-2 ¶ 1). The assailant, a black man who acted alone, forcibly entered the house, and took the woman to a second-story bedroom. (*Id.* ¶ 2). The woman recognized him "immediately" as someone who had come to her back door around a month earlier saying he was lost. (Doc. 67-1 at 6). She was face-to-face with him multiple times during the incident. (*Id.* at 15, 16, 20). During the assault, the woman noticed a three-inch-long scar on the attacker's right arm. (*Id.* at 17).

While the sexual assault was in progress, the woman's minor daughter arrived at the house, accompanied by Stephanie Alexander, an adult, and Ms. Alexander's minor daughter. (*Id.* ¶ 3). After Ms. Alexander entered the house, she went to the bedroom and found the armed assailant and the woman, whose hands were visibly bloody. (*Id.* ¶ 6). In the bedroom, Ms. Alexander covered her eyes and "kept saying I can't see you . . . I don't know who you are . . . I can't identify you . . . [j]ust get out of here." (Doc. 67-1 at 19–20). The assailant ordered Ms. Alexander to lie down, after

2

which he fled and was not seen again. (*Id.* ¶ 7). The whole attack lasted between ten and fifteen minutes. (*Id.* ¶ 5).

Following the assault, the victim was treated at Baton Rouge General Hospital, where a rape kit was prepared. (Doc. 99 at 19). Separately, Ms. Alexander worked with officers to create a composite sketch of the assailant. (Doc. 67-1 at 25). Based on this description, an initial photo lineup was created and presented to the victim on December 15, six days after the assault. (*Id.* at 25–26). This lineup consisted of 48 pictures arranged in groups of six, and did not contain any photo of Plaintiff. (Doc. 130 at 5). The victim did not recognize the person who attacked her in any of those photos. (*Id.*).

The next day, Groht and Mondrick presented the victim a single photo lineup of six images, none of whom was Plaintiff. (Doc. 115-5 at 132). The victim made no positive identification from this line up but did say that two of the photos depicted individuals who looked similar to the person who attacked her. (*Id.*).

On January 3, 1983, the victim was shown five more lineups of six photos, none of which included Plaintiff and none of which she recognized. (*Id.* at 137–138). Later the same day, an informant named Plaintiff as the attacker. (*Id.* at 138). The police returned to show the victim a six-photo lineup that included a photo of Plaintiff in position four. (*Id.*). "The victim viewed the . . . lineup for approximately ten (10) seconds[,] and then she put her finger on photo #4[,] and she began to tremble." (*Id.*). The victim used a paper to cover the hair of the person in photo four and the person in photo two, and then dismissed photo two as displaying an individual who was "too

3

big" and whose face "was too fat." (*Id.*). Photo four, she said, "looked very, very close to her attacker," and she "felt pretty sure that this was the man." (*Id.*). She was not, however, positive of her identification, and asked for a side view lineup. (*Id.*)

When presented with the side view lineup that same day, the victim said that the image of Plaintiff, now in position two, "looked the most like" her attacker, "but she could not positively say." (*Id.*).

The next day, detectives obtained a more recent photo of Plaintiff. (*Id.* at 140). They noticed "a striking resemblance" between the composite sketch, "which was prepared from information furnished by the victim," and the "picture of [Plaintiff]." (*Id.*). The detectives created a lineup using the recent photo of Plaintiff in position number one. (*Id.* at 141). This time, the victim "immediately pointed to" the photo of Plaintiff, and "became very excited." (*Id.*). "Detectives noted that the victim's hands were trembling[,] and her lips were quivering[,] and that she turned pale." (*Id.*). She screamed "in a loud voice that the subject in position #1 was the subject that raped her." (*Id.*). Later, the victim testified that when she saw the photo of Plaintiff in the final lineup, she "jumped out of the chair screaming this is the one." (Doc. 67-1 at 25–26). She also testified that after seeing the photo, "[i]t was the best feeling in the world to know that there wasn't any doubt left in [her] mind." (Doc. 67-1 at 25–26). She did not "hesitate in any fashion" when identifying the man. (*Id.* at 31).

In all, the victim was shown photographic lineups on five separate occasions—on December 15 and 16, twice on January 3, and a final time on January 4. (Doc. 130-1 ¶ 3). Plaintiff Archie Williams appeared in three photo arrays.

4

Two days after the final photo lineup, the woman went to a physical lineup where she "saw [Plaintiff] instantly." (Doc. 67-1 at 33). She later identified Plaintiff in open court at his trial, (*id.*), where she described a distinctive scar on the right arm of the man who raped her. (*Id.* at 35). Following the in-court identification, Plaintiff stood before the jury to reveal just such a scar on his right arm. (*Id.*). Plaintiff was convicted on April 21, 1983, and sentenced to 30 years for aggravated burglary, 50 years for attempted murder, and life in prison for aggravated rape. (Doc. 64-1 at 3).

Tragically, the victim was completely mistaken in her identification. For 36 years, Plaintiff maintained his innocence. No physical evidence had connected him to the crime. (*See* Docs. 99 at 14; 96-1 at 3). Finally, in 2019, Plaintiff was released from prison when latent fingerprint evidence from the crime scene was examined using a fingerprint database created in 2014, and a different man was identified as the attacker. (Doc. 70-3 at 4).

### b. Procedural History

On March 17, 2020, Plaintiff filed this lawsuit against the Police and Forensic Defendants for their alleged misconduct in the investigation and prosecution of the criminal case for which he was convicted. Against the Police Defendants, Plaintiff alleged Fourteenth Amendment violations under 42 U.S.C. § 1983 for fabrication of evidence through the use of impermissibly suggestive identification procedures, failure to disclose exculpatory evidence, unconstitutional policy, custom, or practice of failing to train or supervise, supervisor liability. (Doc. 10). Plaintiff also alleged state law claims for malicious prosecution, spoliation of evidence, intentional

infliction of emotional distress, negligence, and vicarious liability, all arising from the same facts underlying the § 1983 claims. (*Id.*).

The Police Defendants move for summary judgment on all claims, asserting the defense of qualified immunity. (Doc. 115). Plaintiff opposes the Motion but only responds to the claim for impermissibly suggestive identification procedures. (Doc. 130).

## II.    LAW AND ANALYSIS

### a. Standard

The summary judgment standard is well-set: to prevail, Defendants must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this assessment, the Court must view all evidence and make all reasonable inferences in the light most favorable to Plaintiff—the non-moving party. *Owens v. Circassia Pharms.*, Inc., 33 F.4th 814, 824 (5th Cir. 2022). Even so, under the Federal and Local Civil Rules, Plaintiff must counter with evidence to support his claims: "A non-movant will not avoid summary judgment by presenting speculation, improbable inferences, or unsubstantiated assertions." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quotation marks omitted); *see also* M.D. La. Local Rule 56. To the point, summary judgment is required if Plaintiff fails to "produce any summary judgment evidence on an essential element of [his] claim." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### b. Discussion

The Police Defendants invoke qualified immunity. The qualified immunity doctrine turns the traditional summary judgment burden on its head, requiring Plaintiff—the *non-moving* party—to "demonstrate the inapplicability of the defense." *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) (quotation marks omitted). To meet his burden, Plaintiff must "(1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were clearly established at the time of the violation." *Id.* (quotation marks omitted). The Court may address either prong of the analysis first, *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 473 (5th Cir. 2019), and Plaintiff's failure to carry his burden at one prong is fatal, *e.g.*, *Babinski v. Sosnowsky*, 79 F.4th 515, 522 (5th Cir. 2023). The Court will address the fabrication of evidence claim first, followed by the claim for failure to disclose exculpatory evidence, the claim against the City/Parish for failure to train and supervise, and the state law claims.

### i. Fabrication of Evidence Through Impermissibly Suggestive Identification Procedures

Plaintiff alleges that Defendants Groht, Mondrick, and Woodring "engaged in unreasonable, unnecessary, and unduly suggestive identification procedures" which were "intended to communicate and/or suggest to [the victim] that Archie Williams was the actual assailant," in violation of Plaintiff's Fourteenth Amendment right to due process. (Doc. 10 ¶ 64). In particular, Plaintiff argues that the violation occurred when the victim was presented with successive photo lineups depicting Plaintiff.

(Doc. 130 at 14). The Police Defendants argue that the identification process did not violate constitutional protections.

"It is the likelihood of misidentification which violates a defendant's right to due process," making an identification procedure that leads to a very substantial likelihood of misidentification the "primary evil to be avoided" when presenting photo lineups. *Neil v. Biggers,* 409 U.S. 188, 198 (1972) (citing *Simmons v. United States,* 390 U.S. 377, 384 (1968)). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.* Yet, even if an identification procedure was unnecessarily and impermissibly suggestive, a constitutional violation is not guaranteed. Rather, the next step is to determine whether, "under the totality of the circumstances[,] the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199; *see also Manson v. Brathwaite,* 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony."); *Abdur Raheem v. Kelly,* 257 F.3d 122, 133 (2d. Cir. 2001) ("In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." (citations omitted)).

Courts around the country have consistently held, including before Plaintiff's conviction up to the present day, that over-representation of a defendant in photo arrays does not make an identification procedure impermissibly suggestive, let alone give rise to "a very substantial likelihood of irreparable misidentification." *Simmons,*

390 U.S. at 384; *see United States v. Falange*, 426 F.2d 930, 935 (2nd Cir. 1970) (inclusion of three photographs of defendant, taken years apart and at different angles, in an array of sixteen pictures was not a denial of due process); *United States v. Cunningham*, 423 F.2d 1269, 1271–73 (4th Cir. 1970) (affirming admission of testimony concerning photographic identifications as not impermissibly suggestive although seven of fourteen photographs were of appellants, and the only color photographs were of appellants and a codefendant); *Williams v. Lavigne*, 209 F. App'x. 506, 510 (6th Cir. 2006) ("Clearly established federal law does not mandate a finding of undue suggestiveness merely because a witness viewed multiple photo arrays and lineups before ultimately identifying the defendant."); *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002) ("[T]here is nothing per se impermissible about placing the same subject in two different identification procedures."); *United States v. Martinez*, No. CA 11-16, 2012 WL 3059728, at *7 (D. Del. July 25, 2012) (quoting *United States v. Eatherton*, 519 F.2d 603, 608 (1st Cir. 1975)) (finding that law enforcement using two photo arrays was not impermissibly suggestive, as "the agents did not specify which photo to select, and the resulting identification was an 'independent decision made without difficulty.'"); *United States v. Diaz*, 248 F.3d 1065, 1103 (11th Cir. 2001) (affirming district court's finding that identification procedures were not unnecessarily suggestive where witnesses were shown different photo arrays on two different occasions weeks apart and presented a separate photo array six months later with a different picture); *English v. Cody*, 241 F.3d 1279, 1283 (10th Cir. 2001) (use of a petitioner's photo in a second lineup after a witness chose

the wrong picture in an initial lineup is not unnecessarily suggestive). *see also Ragunauth v. Ercole,* 07 CV 1692, 2008 WL 5401586, at \*9 (E.D.N.Y. Dec. 23, 2008) (finding "the witness viewing petitioner two times in a photo array did not taint the subsequent lineup"); *Langston v. Sherman,* No. 117CV01108, 2018 WL 3436964, at \*30 (E.D. Cal. July 13, 2018) ("[T]he law does not deem impermissible suggestiveness to arise whenever police or prosecutors expose a witness to a defendant or his or her picture on multiple occasions."); *cf. Diggs v. Spitzer,* No. 06-CV-584S, 2007 WL 3036862, at \*8 (W.D.N.Y. Oct. 16, 2007) (using two photos of a defendant in the same array is not unnecessarily suggestive); *Flynn v. Pennsylvania Dep't of Corrections,* No. 91-7888, 1992 WL 50110, at \*3–4 (E.D. Pa. Mar. 2, 1992) (same).

In *Simmons,* the Supreme Court upheld the use of a six-photo lineup in which the defendant appeared in multiple photos. *Simmons,* 390 U.S. at 385. That case was decided in 1968, 15 years before the investigation and trial of Plaintiff, which means that *Simmons* was established law when the victim here was shown multiple lineups featuring Plaintiff. *Id.* Police officers are entitled to qualified immunity if there is no constitutional violation, or if the conduct did not violate law clearly established at the time. *Cole v. Carson,* 935 F.3d 444, 451 (5th Cir. 2019), *as revised* (Aug. 21, 2019). Because the law was clearly established at the time of the investigation into Plaintiff that the appearance of a suspect in multiple photo arrays on its own does not violate due process, the Court finds that the lineup procedures used here did not violate Plaintiff's due process rights. Importantly, there is no evidence to indicate that the victim here was told anything about the progress of the investigation, or that the

police officers in any other way suggested which person in the pictures was under suspicion. In other words, there is no indication that the identification procedure used here was unnecessarily or impermissibly suggestive. Defendants Groht, Mondrick, and Woodring are accordingly entitled to qualified immunity and Plaintiff's claims against them will be dismissed.

### ii. Failure to Disclose Exculpatory Evidence

Next, the Police Defendants move for summary judgment on Plaintiff's Count Five, which alleges a Fourteenth Amendment due process violation against Groht and Mondrick for an alleged failure to disclose exculpatory evidence. (Doc. 115-2 at 8–9). In his Amended Complaint, Plaintiff alleges that Groht and Mondrick failed to disclose to prosecuting attorneys a statement from the victim "that her attacker did not ejaculate" when he raped her. (Doc. 10 ¶ 10). Plaintiff further alleges that this statement was purposefully withheld to inculpate Plaintiff. As mentioned above, however, Plaintiff fails to contest Defendant's Motion as to this claim.

When summary judgment is unopposed, "[t]he movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed." *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 (5th Cir. 1995) (citing *Hibernia Nat'l Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985)). In this District, however, the failure to file an opposition requires the Court to deem the moving party's statements of uncontested material facts admitted. *See* M.D. La. LR 56(f).

11

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The prosecutor's duty to provide favorable evidence includes impeachment evidence and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). To prevail on a *Brady* claim, a defendant or plaintiff must show that (1) the prosecutor suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to guilt or punishment. *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) (citing *Brady*, 373 U.S. at 87).

Notably, here, Plaintiff argues that *police officers* involved in the criminal investigation of Plaintiff committed a *Brady* violation, not the prosecutors who tried Plaintiff's criminal case. (Doc. 10 at 24–25). *Brady*, however, generally does not extend to police officers. *Mowbray v. Cameron Cnty., Tex.*, 274 F.3d 269, 278 (5th Cir. 2001). Instead, the Fifth Circuit has held that although neither police officers or lab technicians have a *Brady* duty to disclose exculpatory evidence to criminal defendants, allegations that such parties "elicited false evidence and deliberately concealed exculpatory evidence from all parties, including the prosecution," will support § 1983 liability. *Mowbray v. Cameron County, Tex.*, 274 F.3d 269, 278 n.5 (5th Cir. 2001). But Plaintiff has pointed to no evidence that Groht or Mondrick "deliberately concealed" the evidence in question. *See id.* Nor has Plaintiff offered any argument in support of this claim.

12

For these reasons, the Court finds that no constitutional violation occurred and Groht and Mondrick are entitled to qualified immunity.

### iii. Failure to Train and Supervisory Liability

The Police Defendants also move for summary judgment on Plaintiff's claims against the City/Parish Defendant for failure to train or supervise. "Municipalities cannot be held liable under [§] 1983 on a *respondeat superior* theory, and a [city or parish] is not liable where an injury is caused solely by one of its employees." *Harmon*, 478 F. Supp. 3d at 573 (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978)). *Monell* established the standards for a municipal liability claim under § 1983 by articulating the three elements of such a claim: "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (discussing *Monell*). "As is well established, every *Monell* claim requires 'an underlying constitutional violation.'" *Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017). As explained above, the Court has found that no underlying constitutional violation occurred here. For this reason, Plaintiff's failure to train or supervise claim fails.

A "supervisory official may be held liable under section 1983 for the wrongful acts of a subordinate when [the supervisory official] breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury." *Tuttle v. Sepolio*, 68 F.4th 969, 975 (5th Cir. 2023) (quotations omitted). Again, however, the Court has

13

found that no underlying constitutional violation occurred. For this reason, Plaintiff's supervisory liability claim fails as well.

### iv.  State Law Claims

Finally, Defendants move for summary judgment on Plaintiff's state law claims for malicious prosecution, spoliation of evidence, intentional infliction of emotional distress, negligence, and vicarious liability, arguing that "Plaintiff cannot establish a basis of support for each essential element" of such claim. (Doc. 115-2 at 13). Plaintiff has failed to point to any evidence whatsoever in support of his state law claims. Moreover, the Court has found that no constitutional violation occurred with respect to any of Plaintiff's § 1983 claims. Plaintiff's state law claims, which are based on the same conduct that underlies Plaintiff's § 1983 claims, will therefore be dismissed with prejudice.

## III.  CONCLUSION

Regrettably, although a flawed prosecution and a mistaken eyewitness sent Plaintiff to prison for decades, and the State of Louisiana has definitively stated in its joint filing seeking to vacate Plaintiff's sentence that Plaintiff is factually innocent of his crimes, (*see* Doc. 70-3), the law does not provide a remedy for Plaintiff's claims here.

Accordingly,

**IT IS ORDERED** that Defendants City of Baton Rouge/Parish of East Baton Rouge, Alfred Charles Mondrick, Marjorie Groht, and Steve Woodring's **Motion for Summary Judgment (Doc. 15)** be and is hereby **GRANTED**, and Plaintiff's claims

against these Defendants be and are hereby **DISMISSED WITH PREJUDICE**.

Judgment will issue separately.

Baton Rouge, Louisiana, this **17th** day of October, 2024

_____

**BRIAN A. JACKSON, JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**